In the Matter of the Application of JOSEPH A. BRODERICK, Superintendent of Banks of the State of New York, for an Order Approving the Purchase of Certain Stock by JOSEPH A. BRODERICK for the Benefit of the Creditors of the State Bank of Canastota, N. Y., in Liquidation.

Supreme Court, Madison County, October 29, 1931.

*R. R. Calli,* for Superintendent of Banks.

*Coley & Kiley,* for Alfred E. Dew and W. Frederick Dew, creditors of the State Bank of Canastota, N. Y.

*Clarence Conley,* for Claude B. Ellis, debtor of the State Bank of Canastota, N. Y.

HEATH, J.    This is an application by the New York State Superintendent of Banks for an order approving the purchase by him as such Superintendent of certain stock for the benefit of the creditors of the State Bank of Canastota, N. Y.

On the 19th day of December, 1930, pursuant to section 57 of the Banking Law, the Superintendent of Banks of the State of New York took over the affairs of the State Bank of Canastota, N. Y., for the purpose of liquidation.    Among the assets were certain collateral notes given by one Claude B. Ellis, totalling $18,990, secured by a collateral assignment of 320 shares of common stock in the A. E. Dew & Sons, Inc., and 65 shares of common stock in the Worlock Stone Co., Inc.    Payment of these obligations having been refused, the Superintendent of Banks, on August 1, 1931, after due notice, held a public sale of said stock.    When the stock of the Dew Corporation was offered, various bids were made, commencing at five dollars per share and resulting in a bid of eighteen dollars by one A. E. Dew.    The next and final bid was nineteen dollars per share made by a representative of the Superintendent of Banks and the stock was struck off to said Superintendent. On the sale of the stock in the Worlock Stone Co., Inc., a representative of the Superintendent of Banks started the bids at ten dollars per share; a Mr. Ballard bid eleven dollars, whereupon the representative of the Superintendent of Banks bid twenty dollars and the stock was declared sold to the said Superintendent.

The question presented to the court is whether or not the Super-

intendent of Banks has the authority, under the Banking Law, to make these purchases in his name.

When the State Superintendent takes over the affairs of a bank pursuant to section 57 of the State Banking Law he does so for one purpose, namely, liquidation. It would hardly be claimed that he has the power to engage in business in an attempt to recoup the bank's losses. Within reason he should take whatever steps are necessary to conserve the assets of the bank. If the bank owns a building and the roof leaks, the Superintendent should be permitted to expend a reasonable sum to repair the leak, pending sale. Section 69 of the Banking Law provides: " The superintendent is authorized, upon taking possession of the property and business of such corporation or private banker or personal loan broker, to liquidate the affairs thereof and to do all acts and to make such expenditures as in his judgment are necessary to conserve its assets and business." The State Superintendent of Banks urges that the language just quoted is broad enough to allow him to expend money for the purchase of stock offered for sale pursuant to a collateral agreement. It is urged that if substantial bids are to be obtained it is necessary for the State Superintendent to make bids and have authority to consummate a purchase. Such authority would be fraught with many dangers and it is doubtful that the statute so provides.

While it is true that the Superintendent of Banks is charged with the duty of disposing of the assets of the bank to the best advantage, it is doubtful if that duty extends further than providing for a freely conducted and open public sale. Perhaps after a sale has been had the Superintendent of Banks may present to the court facts to establish that the purchase price obtained on the sale was inadequate in view of the actual market value of the thing sold. If so the sale need not be confirmed and another sale may be required. It is within the possibilities of the case that a second or third sale might not produce a price which the Superintendent of Banks maintained was the real market value of the thing sold. But if after one or two resales, fairly conducted, it were found that the price bid was still lower than that which the Superintendent of Banks maintained was a fair price, the court might be justified in coming to the conclusion that the Superintendent of Banks was in error as to what the true market value really was. It must be remembered that the sale of assets of a bank is of interest to a great many people. It is not similar to the sale of an automobile held under a chattel mortgage, for in that instance after all, the only persons really interested are the mortgagor and the mortgagee. The sale of assets of a bank interests hundreds,

perhaps thousands of persons, *i. e.*, the depositors, the stockholders and other creditors of the bank. In other words, since it is the duty of the Superintendent of Banks to convert the assets into cash, it would seem that he should be held to have complied with that duty if he has provided a duly advertised and freely conducted public sale.

There may be no end to the process of liquidation if the Superintendent of Banks has the authority to buy property. As an illustration of what may happen, an actual occurrence in the liquidation of the State Bank of Canastota, N. Y., may be cited. The Superintendent of Banks has filed an application to confirm a sale of real estate under a second mortgage foreclosure. The second mortgage amounted to $750, the first amounted to $2,000. The State Superintendent of Banks bid in the property for the sum of $200 subject to the first mortgage. He has filed a petition to confirm that sale to himself, also asking leave to expend $2,000 and accrued interest to pay up the first mortgage which is about to be foreclosed, as well as $218.33 for taxes. If the Superintendent has the right to take title in his own name for the sum of $200, he may well be justified in asking leave to expend an additional $2,218.33 to conserve what he has already bought. But can it be argued that the Legislature intended the Superintendent to have the authority to speculate as to future values or to repudiate a market value set after a fair and free public sale?

The only reported case where the Superintendent of Banks bid in the property in his own name is *Hutton* v. *Consolidated Briarwood Estates* (185 App. Div. 663 [1918]). In that case a mortgage was foreclosed against lots which were under contract to be sold to the plaintiff. Inasmuch as the Superintendent of Banks had accepted payments from the plaintiff on the contract, the court might well hold, and indirectly did hold, that it was the duty of the Superintendent of Banks to protect the plaintiff, thereby conserving the assets of the bank and preventing an action by the plaintiff for damages.

It is the opinion of this court that the sale held on August 1, 1931, should not be confirmed for the reason that purchase was made in the name of the Superintendent of Banks. A resale should be had after proper notice.